**VILLAGE OF PALATINE, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE, Defendant.**

No. 90 C 1712.

United States District Court, N.D. Illinois, E.D.

June 7, 1990.

in Palatine. The complaint alleges that the Postal Service violated the National Environmental Policy Act, the Intergovernmental Cooperation Act, the Administrative Procedure Act, Executive Order No. 11988, and the administrative regulations that govern the operation of the Postal Service.

We denied Palatine's motion for a temporary restraining order and granted in part Palatine's motion for expedited discovery. Shortly thereafter, and well before discovery was complete, the Postal Service moved to dismiss, or in the alternative, for summary judgment, on each count. For the following reasons, we deny the motion on all counts. We set this matter for a status conference on June 11, 1990, at 10:00 a.m., to consider what discovery necessarily must be completed and to establish a date for an expedited hearing, if necessary.

Robert T. Markowski, Edward J. Lewis, II, Robert L. Denby, Jenner & Block, Chicago, Ill., for plaintiff.

U.S. Atty., Terry M. Kinney, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

The Village of Palatine (Palatine) has filed a five-count complaint asking that we enjoin the United States Postal Service (Postal Service) from proceeding with its plans to construct a major regional mail distribution center, truck terminal and vehicle maintenance facility on a 43–acre site

## LEGAL BACKGROUND

The National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U.S.C. § 4321 *et seq.*, requires that agencies prepare an environmental impact statement (EIS) for major federal projects that significantly affect the quality of the human environment. Environmental impact statements are extensive studies that must include, *inter alia,* a detailed discussion of alternative means to fulfill the goal of the contemplated project and the potential environmental impact of those alternatives. 42 U.S.C. § 4332(2)(C).[1]

To determine whether a contemplated action will cause a significant impact and thus require a full EIS, agencies conduct a more limited study called an environmental assessment (EA). If an environmental assessment properly concludes that a project's impact on the environment will not be significant, an agency may forego

---

1. Environmental impact statements must contain "a detailed statement" that describes:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternative to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C.A. § 4332(2)(C) (West 1977).

preparing an EIS. When a project will have some impact on the environment, but not a significant enough impact to require an environmental impact statement, section 102(2)(E) of the National Environmental Policy Act nevertheless requires agencies to consider alternatives that may have less environmental impact. 42 U.S.C. § 4332(2)(E).

The Council on Environmental Quality has drafted binding regulations to guide federal agencies in fulfilling their responsibilities under NEPA. *See* 40 C.F.R. §§ 1501–08 (1989). The Supreme Court has held that these regulations deserve "substantial deference." *See, e.g., Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 1848–49, 104 L.Ed.2d 351 (1989); *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). The regulations require federal agencies to draft environmental assessments to determine whether a full environmental impact statement is required. 40 C.F.R. §§ 1501.3, 1501.4 (1989). They also require that every federal agency draft its own administrative regulations to implement and supplement the regulations promulgated by the Council on Environmental Quality. 40 C.F.R. § 1507.3 (1989).

Executive Order 11988, Floodplain Management, issued on May 27, 1977, instructs federal agencies to "avoid direct or indirect support of floodplain development wherever there is a practicable alternative." 3 C.F.R., 1977 Comp., p. 117. It requires that before taking action, federal agencies determine whether the action will occur in a floodplain and further requires agencies to consider alternatives that avoid adverse effects and development that is incompatible with the floodplain. It requires agencies to adopt administrative regulations implementing the order.

Section 401(a) of the Intergovernmental Cooperation Act of 1968, now codified at 31 U.S.C. § 6506, recognizes that the "sound and orderly development of urban communities depends to a large degree on the social and economic health and the sound development of small communities and rural areas." To promote that sound development, it directs the President to pre-

scribe regulations to govern the planning of federal projects that will have a significant impact on community development. It lists several specific objectives and directs that federal officials make "reasoned choices" when those objectives conflict. One objective listed is "appropriate land uses for housing, commercial, industrial, governmental, institutional, and other purposes." 31 U.S.C.A. § 6506(b)(1). Executive Order 12372, issued on July 14, 1982, directs federal agencies to implement the statute and further directs agencies to draft administrative regulations that will guide their implementation of the Intergovernmental Cooperation Act. 3 C.F.R., 1982 Comp., p. 197.

The United States Postal Service has drafted regulations to implement its duties under the National Environmental Policy Act, as required by the regulations of the Council on Environmental Quality. Additional regulations of the Postal Service specify how its officials will comply with the Intergovernmental Cooperation Act and Executive Orders Nos. 11988 and 12372. *See* 39 C.F.R. Part 775 (1989) (Environmental Procedures); 39 C.F.R. Part 778 (1989) (Intergovernmental Cooperation Act and Executive Order 12372); 39 C.F.R. Part 776 (1989) (floodplains). The Postal Service has also issued more specific regulations in Handbook RE–6, titled Environmental and Intergovernmental Review Procedures. This publication, designated as Transmittal Letter 4 and dated May 29, 1987, is attached to Palatine's complaint as Exhibit 4. The regulations, including the regulations in Handbook RE–6, are binding on the Postal Service and can be enforced by proper parties in United States courts. *See Peoples Gas Light & Coke Co. v. U.S. Postal Service,* 508 F.Supp. 808, 819 & n. 14 (N.D.Ill), *aff'd on relevant ground,* 658 F.2d 1182, 1189–90 (7th Cir.1981).

■ Finally, the Administrative Procedure Act, 5 U.S.C. § 701 (APA), which Palatine cites as a basis for judicial review, provides that courts may review actions taken by "each authority of the Government of the United States," except when a statute prohibits review or where "agency

action is committed to agency discretion by law." *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). When Congress created the Postal Service it specifically exempted the new entity from some federal statutes. *See* 39 U.S.C. § 410. We do not need to decide whether Congress intended to exempt the Postal Service from the Administrative Procedure Act. The Seventh Circuit has taken the view that the APA merely codified common law presumptions that agency actions cannot escape judicial review. Consequently, even if the Postal Service were exempt from the requirements of the statute itself, courts may nevertheless apply the statute's standards of review when litigants complain that the agency violated its own regulations. *See Peoples Gas, Light & Coke Co. v. U.S. Postal Service,* 658 F.2d 1182, 1191 (7th Cir.1981).

## FACTUAL BACKGROUND

■ When deciding motions to dismiss, courts accept the allegations of the complaint as true. When evaluating a defendant's motion for summary judgment, courts accept the documented allegations of the complaint except when the defendant has submitted affidavits or other evidentiary materials to dispute them. In this case, however, Palatine has tended to characterize even undisputed facts in a manner unflattering to the Postal Service and has selectively emphasized those portions of the documentary record that support its contentions. What follows, then, is a version of the facts, the tenor of which the Postal Service vigorously disputes and the specifics of which it disputes in part.

This dispute arises from the Postal Service's decision to locate a major regional processing center and truck terminal (the facility) on a 43–acre parcel in Palatine known as the McDade property, at the intersection of Northwest Highway and Route 53. Before the Postal Service announced its plans, Palatine regarded the unoccupied site, zoned as commercial property, as a prime location for valuable development that would generate both sales and property tax.

The proposed facility includes a two-story 600,000 square foot trucking terminal with docks that can accommodate fifty semi-trailer trucks. It also includes a maintenance building, driveways, service ramps, and parking areas for idle trucks, in addition to a parking lot large enough to accommodate almost a thousand cars. The facility will operate around the clock, seven days a week, beginning with 1500 workers and eventually employing 2500 workers.

According to Palatine's zoning ordinances, the Postal Service facility is appropriate only in an area zoned for manufacturing. Building the Postal Service facility defeats Palatine's plans to develop the commercially-zoned McDade property and substantially impairs Palatine's ability to develop three adjoining parcels for commercial use. As land owned by the Postal Service is not subject to local taxes, the Postal Service decision removes the commercial property from the tax base. Palatine contends that the McDade site alone could produce $25 million in tax revenue during the 25–year estimated useful life of the Postal Service facility.

Palatine does not simply allege that the facility will deprive it of taxes and thwart its long-range land use plans. It alleges that adding even more trucks to the already congested Northwest Highway will adversely affect Palatine and that running trucks at all hours past nearby residential areas will also adversely impact the human environment.

About a third of the McDade land is currently designated as being within the 100–year floodplain of the Arlington Heights Branch of Salt Creek. Palatine asserts that the Postal Service's plans and procedures have violated federal regulations that apply to construction that occurs within, or that will impact on, land designated as part of a floodplain.

The Postal Service's plans to build on the McDade site have generated a significant amount of public controversy. Palatine officials and the general public have opposed the Postal Service plans, and Palatine has successfully enlisted the support of other units of local government. The Governor

of Illinois, several representatives of Congress, and both Illinois senators have asked the Postal Service to accommodate Palatine's concerns.

The controversy stems from the growth in the North suburban area. The Postal Service currently services zip codes 600, 601, 602 and 603, from a mail processing facility in River Grove. It considers that facility outdated and inadequate and plans to divide its operations between two new facilities. The McDade facility will service zip codes 600 and 602.

The Postal Service initially defined a "preferred area" for the new facility for zip codes 600 and 602 that did not include Palatine. In the summer of 1987, the Postal Service determined that the McDade site was available and pursued that site. Palatine first received notice of the Postal Service's interest in the McDade site in August 1987.

In November 1987, before performing any environmental analysis, the Postal Service paid a non-refundable fee of $400,000 for an option to buy the McDade site at a price of $9.5 million, which was $1.3 million more than the appraised value. The Postal Service then retained a consulting firm to perform an environmental assessment. The option was good until March 31, 1988.

In January 1988, the consulting firm issued a draft EA for public comment. It revealed that 15.8 of the 43 acres of the McDade property was classified as part of a floodplain. Because Postal Service plans at that time called for significant construction within the floodplain, the January 1988 EA could not and did not conclude that there would be no significant impact upon the environment.

Palatine received a revised draft environmental assessment on March 23, 1988, eight days before the Postal Service's option on the McDade property was to expire. The revision reflected a change in the Postal Service's construction plans. Instead of a single-story building, the Postal Service now contemplated a sixty-foot tall building. Under the revised plans, no construction would take place within the 15.8 acres classified as floodplain.

On March 29, Palatine commented on the revised draft environmental assessment and contended that it failed to adequately consider various effects on the environment, including the facility's adverse effect on the floodplain, on the wetland located on the McDade property, on traffic congestion, on air quality, on the quality of nearby waterways, and on the units of local government that would lose tax revenue. Palatine further objected that the Postal Service's contemplated use of the land was not consistent with Palatine's long-range plan and further objected that the Postal Service had failed to properly consider alternative sites that would cause less adverse environmental effects.

Just before the Postal Service's option on the McDade property was to expire, the Postal Service offered Palatine a deal. If Palatine would pay the Postal Service $525,000, the Postal Service would not purchase the McDade site. On March 31, 1988, the Postal Service exercised its option and bought the McDade property.

In May 1988, the Postal Service issued the final revised environmental assessment for the McDade site. This report stated that there would be no significant environmental impact and thus made the finding that relieved the Postal Service from the obligation to prepare a full environmental impact statement.

In August 1988, the Northeastern Illinois Planning Commission issued a formal analysis of the 1988 environmental assessment. The Commission criticized the EA's "brief" and "perfunctory" dismissal of twenty-eight potential alternative sites and made some specific suggestions for implementation. It otherwise concluded that the EA conformed to federal regulations and guidelines.

In the fall of 1988, Palatine suggested some alternative sites outside Palatine and the Postal Service rejected them. In early 1989, Palatine then suggested an alternative site within Palatine. This property, known as the Brandt site, occupies 34 acres immediately north of the McDade site. It is zoned for manufacturing and could thus

accommodate the Postal Service facility without violating Palatine's zoning scheme.

Considering the restrictions against building in the floodplain, the 34–acre Brandt site offers the Postal Service more buildable acreage to the Postal Service than the 43–acre McDade site. Furthermore, as the Brandt site does not front on a major roadway, it does not offer the same potential for commercial development as the McDade site. Construction on the Brandt site would thus interfere less with Palatine's plans for commercial development. In May 1989, the Postal Service agreed to consider the Brandt site as a possible alternative to the McDade site.

Palatine also obtained a commitment from the Mitroff Companies to develop the McDade site if the Postal Service moved to the Brandt site. Mitroff proposed a commercial development that comported both with Palatine's long-range plan and its zoning ordinance.

Although the Postal Service agreed to study the Brandt site, it indicated that it wanted to proceed at the McDade site because of the time and money already spent in planning for that location. Nevertheless, the Postal Service concluded that the Brandt site could be a viable alternative. On July 14, 1989, the Postal Service reported on the Brandt site in an alternative site evaluation study that stated that the Postal Service facility could locate at the Brandt site with a relatively minor long-term impact on the Postal Service operations, as long as direct access to Northwest Highway were provided.

At the urging of congressional representatives, the Postal Service continued to negotiate with Palatine about building at the Brandt site instead of the McDade site. The Postal Service identified eight issues that needed to be resolved. Several issues revolved around the Postal Service's concern that it might not be able to sell the McDade site without a financial loss. Palatine provided assurances requested by the Postal Service and further negotiated a plan to address the Postal Service's concern about disposing of the McDade property. Together with Mitroff, Palatine proposed that the Postal Service simply trade the McDade site for the Brandt site. Mitroff accordingly arranged, in September 1989, for an option to purchase the Brandt site.

In early September 1989, Assistant Postmaster General Stanley Smith told a representative of Palatine that the proposed swap of the two sites was in the best interest of the Postal Service. At a second meeting later in September, Smith told Palatine representatives that the Postal Service must receive an additional $15 million to abandon its plans to build on the McDade site. In the view of Postal Service, this figure represented the difference in the value of the two sites, the cost of redesigning the facility for the Brandt site, plus extra construction costs the Postal Service contended would be incurred.

Further negotiations took place in November 1989. Mitroff agreed to pay approximately $3 million in connection with the proposed land trade, including over $2.6 million as compensation for the differing market values of the parcels. By the end of November, the Postal Service and Palatine reached agreement on all but two issues. First, the Postal Service contended it would cost an extra $5 million to build on the Brandt site. Of this amount, $4.3 million represented the cost of building a parking garage for employees that was not needed on the McDade site. The second issue related to developing a road to connect the Brandt site to Northwest Highway.

Despite this progress in negotiation, on November 29, 1989, the Director of the Postal Service Facilities Service Center in Chicago declared that further discussions on the land swap would not take place. In December, however, Postal Service officials in Washington instructed Chicago Postal Service officials to resume negotiations. Subsequently, Chicago Postal Service officials demanded, for the first time, that Palatine provide two access roads to the Brandt property.

By January 10, 1990, the Postal Service conceded it did not need two access roads. Furthermore, the Postal Service agreed that the $4.3 million parking garage was

not needed because the Brandt site could accommodate the parking envisioned for the McDade site. Mitroff designed plans for a four-lane road that would connect the Brandt site to Northwest Highway.

Without any further substantive communication, the Postal Service announced on January 29, 1990, that it would proceed to build on the McDade site. The Postal Service then released its designs to contractors and asked for bids. Palatine subsequently appealed to the Chairman of the Postal Service Board of Governors, who responded, on March 2, 1990, that "there cannot be any further delay in the start of construction, nor will the Postal Service suffer a loss on investment in the McDade property should a swap for the Brandt farm site be feasible."

Two United States senators and thirteen congressional representatives then asked for a meeting with top Postal Service officials to discuss the Palatine situation. The Postmaster General agreed to schedule a meeting for March 27. On March 21, 1990, the senators and two representatives wrote to the Postmaster General and asked that the Postal Service postpone the date for accepting contractors' bids from March 29 until April 6, to allow time for good-faith discussion.

On March 22, the Postal Service stated it would not agree to the delay requested on Palatine's behalf. The next day, six days before the contractors' bids were due, Palatine filed a five-count complaint asking this court to enjoin the Postal Service from beginning to construct the facility on the McDade site until it complies with the applicable federal statutes, executive orders, and administrative regulations.

We subsequently denied Palatine's motion for a temporary restraining order and granted in part its motion for expedited discovery. We turn now to the Postal Service's motion to dismiss or, in the alternative, for summary judgment.[2]

## DISCUSSION

Palatine has alleged its claims in five counts that overlap to some extent. In all five counts, it insists that the Postal Service has not fulfilled its statutory and administrative obligations and that accordingly, it should be prohibited from going ahead until it has satisfied those obligations. In count I, Palatine alleges that the Environmental Assessment released in May 1988 was for a facility materially different from the one that the Postal Service now intends to construct. In count II, it contends that an Environmental Impact Statement is necessary. In count III, Palatine claims that the May 1988 EA is in any event inadequate because it fails to properly consider the facility's impact upon the human environment. Count IV alleges that even if the EA properly found that building on the McDade site will cause no significant impact, it is nevertheless deficient for failing to adequately consider alternative sites that might have less impact on the environment. Finally, in count V, Palatine complains that the Postal Service has failed to fulfill its obligations under the Intergovernmental Cooperation Act.

The Postal Service responds first by contending that all claims should be dismissed because of laches. It then asserts that it should prevail on each of the five counts. We consider laches first, then count I, then counts III and IV, then count II, and finally count V.

### I. Affirmative Defense of Laches

The Postal Service has asked that we award it summary judgment based on its assertion of the affirmative defense of laches. According to the defendant, two necessary elements of laches are present here: (1) the plaintiff has unreasonably delayed and (2) consequently prejudiced the defendant's position.

■ Defendant contends that Palatine planned to combat the facility in court as early as 1987 but unreasonably delayed filing suit until 1990. In support, the Post-

---

**2.** In its brief in opposition to the USPS's motion, Palatine argues that *it* is entitled to summary judgment on some counts of its complaint. As

Palatine has filed no cross-motion for summary judgment, we discuss only the merits of the motion filed by the Postal Service.

al Service points to a memorandum that circulated among Palatine officials in 1987, which lists litigation as a possible option of last resort. We do not construe this memorandum as an irrevocable commitment or plan to litigate. Palatine did not sit on its rights but instead employed a variety of means short of litigation to achieve its ends. The fact that Palatine chose litigation as a tactic of last, rather than first, resort, is not grounds for dismissing the suit.

■ A year before the current suit was filed, Palatine filed an action in state court to enjoin the Postal Service from demolishing the existing building on the McDade site until Palatine issues a permit. The Postal Service contends that Palatine should then have raised all the issues it raises now. We disagree.

At the time the earlier suit was pending, the Postal Service and Palatine entered into negotiations for the Postal Service to change its plans and construct its facility instead on the Brandt site. As both sides were apparently negotiating in good faith, and thus the start of construction on the McDade site was not imminent, we see no reason why Palatine had any equitable obligation to seek an immediate injunction against building on the McDade site.

In arguing its defense of laches, the government accuses Palatine of acting in bad faith and asking for equitable relief with unclean hands. We note that the May 1988 environmental assessment called for no construction within the floodplain on the McDade site. We further note that when the Postal Service broke off negotiations to move to the Brandt site, the Postal Service proceeded to advertise for bids for construction on the McDade site—with design plans that called for construction on the floodplain. This advertising, which first took place in early 1990, was the first time

that the Postal Service indicated that it would ignore both environmental regulations and its earlier plans and proceed to build on the floodplain. Considering the government's abrupt about-face, its accusations that Palatine proceeded in bad faith and with unreasonable delay are not convincing. Once the government broke off negotiations and advertised for bids on plans that called for building in the floodplain, Palatine proceeded with dispatch to file for an injunction. That is not unreasonable delay.

We also fail to see how the government has been prejudiced. In its brief, the Postal Service contends that Palatine's delay in filing suit caused the Postal Service "to incur additional costs and expenses in proceeding with its construction upon the McDade site." We note that this is not a case where construction has already progressed to the point where resources have already been irrevocably committed to the project and would be wasted if an injunction is granted. Construction has not even begun. While the Postal Service has already expended funds to purchase the McDade site, it had already spent that money before its final environmental assessment was even released in May 1988. As the government made a financial commitment to the McDade site and only later released its revised environmental assessment, there is simply no way that Palatine could have challenged the findings in the EA before the Postal Service expended funds on the land purchase.[3]

Furthermore, we note that throughout its briefs, the Postal Service reminds us that it estimates it is losing $15,000 each day that construction is delayed. Even if this lawsuit were dismissed immediately, however, the Postal Service, according to its own representations to this court, could

---

**3.** Although the Postal Service sent an earlier version of its environmental assessment to Palatine eight days before making an irrevocable commitment to buy the McDade site, Palatine at that time registered numerous objections to the adequacy of the environmental assessment. After receiving those objections, many of which Palatine repeats in this litigation, the Postal Service nevertheless exercised its option to buy the McDade property.

If the money the USPS spent when it bought the McDade property represents part of the prejudice the USPS purportedly sustained as a result of Palatine's delay in litigating, then presumably the USPS is arguing that Palatine should have filed suit in the eight days before the USPS exercised its option or not at all. We do not agree.

not begin construction immediately. In direct response to the claims made in count I, the Postal Service decided to revamp its plans so that no construction will occur in the floodplain. As the new designs were apparently just completed (they have apparently been produced in discovery within the past few days), it appears that delays in the start of construction could be attributed to the Postal Service's attempt to build in the floodplain and its subsequent about-face as soon as this litigation commenced. For these reasons, we reject the Postal Service's bid for judgment on the basis of laches.

We turn now to the Postal Service's motion to dismiss, or in the alternative, for summary judgment, on each of the five counts in Palatine's complaint.

## II. *The Complaint*

We begin with a somewhat simplistic overview of how we believe the regulatory scheme applies to the Postal Service when it builds new facilities. In the National Environmental Policy Act, Congress has directed that agencies must take a hard look at the impact of their plans upon the environment. If a preliminary assessment indicates that the impact will be significant, the agency must engage in a more searching study in which it must also consider such collateral matters as the impact of removing the site from the local tax base. Even if the assessment is that the impact upon the environment will not be significant, the agency nevertheless is required to consider feasible alternative sites to determine whether an alternative site might serve the agency's purpose with even less environmental impact. In addition, by a wholly separate statute, the Intergovernmental Cooperation Act, Congress has directed federal agencies to consider the concerns state and local government may have about the facility's impact upon the ability of those levels of government to carry out their responsibilities, including the impact upon the local tax structure and local land use objectives. Congress has, in effect, told federal agencies to remember that we are all in this together and that an agency should, in considering various alternatives, weigh both the advantages to the agency and the adverse impact upon state and local objectives.

■ Finally, a court plays a limited but significant role in the decisionmaking process. It does not sit as a super zoning board or as a site selection mogul. The agency makes the decision, but it must explain that decision adequately so that a court can determine that it is the end result of the process Congress has mandated and not an arbitrary decision that inadequately takes into account the factors Congress considered important.

### A. *Count I*

■ In count I, Palatine asks us to enjoin the Postal Service from proceeding on the McDade site because no environmental assessment has been conducted for the facility that is presently planned.

The environmental assessment for the McDade site was released in its revised form in May 1988. The plans discussed in that assessment called for no construction in the portion of the McDade site that falls within the floodplain. Indeed, Executive Order No. 11988 and the Postal Service's own regulations forbid construction within the floodplain unless there is no practical alternative, a finding that the Postal Service does not claim to have made.

In early 1990, after the Postal Service broke off negotiations to move its facility to the Brandt site, it advertised for bids for construction that would proceed on the McDade site. These plans differed from the project studied in the May 1988 EA. Two differences are most significant. First, the new plans called for some construction to take place on the floodplain. Second, they did not call for a detention basin with as large a capacity as the May 1988 EA contemplated. Palatine alleges that the current plans differ in additional ways from the project for which the Postal Service completed an environmental assessment in May 1988.

The Postal Service contends that Palatine's claims in count I are now moot because it no longer plans to build the particular facility challenged in count I. The Postal Service acknowledges that it acted

to modify its plans as a direct result of Palatine's lawsuit.

To support its argument that count I is now moot, the Postal Service produced affidavits from Dennis Bryan of the Postal Service and John Talbot, vice-president of Epstein Civil Engineering, Inc. In his affidavit, Bryan states that he has instructed Epstein to redesign the plans for the McDade facility so that there will be no building on the floodplain and further instructed it to comply with the May 1988 EA in completing the redrafting of the plans. Talbot, in his affidavit, confirms that Epstein has been instructed to redesign the plans so that there will be no construction within the floodplain. He further states that a detention basin will be built and that the hydrology and hydraulics of the floodplain will not be affected by the contemplated construction. Talbot does not state, however, whether the detention basin will be as large as contemplated in the May 1988 EA, nor does he otherwise confirm that the redesigned plans, when completed, will fully comply with the May 1988 EA.

In response to the Postal Service's statement of material facts submitted under Local Rule 12($l$), Palatine responds that it does not have enough information to affirm or deny the government's claim that the facility will comply with the May 1988 EA. Although the Postal Service ordered that the facility be redesigned, it had not yet produced the new designs in discovery at the time the papers before us now were filed. We understand now that the new designs were turned over in the last few days.

The government argues that its promise to redesign its plans in accordance with the May 1988 EA is sufficient for us to regard Palatine's claim as moot. At this early stage of the litigation, when the government has just now produced its redesign for Palatine to examine, we do not agree. In the view of the Postal Service, an earlier change in plans required a redraft of the EA. We cannot know whether a redraft or amplification or modification is now necessary when we do not yet know the scope of the presently contemplated changes.[4] We

deny the government's motion to dismiss count I and its motion for summary judgment.

### B. *Count III*

In count III, Palatine challenges the Postal Service's finding, in the May 1988 environmental assessment, that building the facility on the McDade site would not significantly affect the quality of the human environment. Such a finding was necessary before the Postal Service could proceed without preparing a full environmental impact statement. Palatine alleges that the EA inadequately considered a number of adverse environmental impacts. Consequently, Palatine contends, the finding of no significant impact is procedurally flawed, making further construction a violation of both NEPA and the administrative regulations that bind the Postal Service.

#### 1. *Standard of Review*

■ We must first explain the scope of our inquiry and the proper standard of review. The issue here is not simply whether the Postal Service's facility will adversely affect Palatine or the human environment. It is not whether we would choose to locate the facility elsewhere. It is whether the Postal Service exceeded the bounds of its decision-making authority in concluding that its facility would not so *significantly* affect the human environment that a more detailed study of consequences was necessary. *See River Road Alliance v. Corps of Engineers*, 764 F.2d 445, 450 (7th Cir.1985), *cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). The Seventh Circuit has said that when reviewing a finding of "no significant impact," courts should inquire whether the agency took a "hard look" at the relevant factors and made a decision that was neither arbitrary nor capricious. *See Van Abbema v. Fornell*, 807 F.2d 633, 637 (7th Cir.1986).

From these cases, we conclude that we should apply the "arbitrary or capricious" standard of review. The Supreme Court has recently explained the application of that standard of review, which it described as a factual inquiry, in a case involving a

---

**4.** Some of the subsequent discussion of count III is relevant here.

slightly different aspect of agency decision-making under NEPA:

> [T]he reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."

*Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)). The Court went on to say that courts must ensure that agencies make reasoned decisions based on the relevant factors. *Id.* The Supreme Court has also explained that an agency's decision may be arbitrary or capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

### 2. *The Statutory and Regulatory Scheme*

■ From the beginning, Palatine's prime concern has been that the development of the Postal Service facility would deprive local government of the potentially significant tax revenues that would otherwise be forthcoming if private owners developed the McDade site. We do not doubt that depriving Palatine of such significant

tax revenues could significantly affect the community's economic health. No matter how significant, however, we agree with Postal Service that such effects by themselves do not trigger NEPA's requirement that federal agencies file environmental impact statements. The regulations formulated by the Council on Environmental Quality state that "economic or social effects are not intended by themselves to require preparation of an environmental impact statement." 40 C.F.R. § 1508.14 (1989). While the tax consequences of the project are thus not sufficient to require an environmental impact statement, they are certainly not irrelevant. Indeed, the regulations of the Postal Service specifically require that the agency consider the local tax consequences of its project when determining whether to draft an environmental impact statement. *See* United States Postal Service, Environmental and Intergovernmental Review Procedures, Handbook RE–6, Appendix E. Moreover, the Council on Environmental Quality specifies that when a federal project's impact on the physical environment does require an environmental impact statement, then agencies must also detail the economic and social impacts and take them into consideration. 40 C.F.R. § 1508.14 (1989).

What, then, should we consider in determining whether or not the Postal Service was arbitrary or capricious in concluding that its facility would not significantly impact the human environmental and that, therefore, an EIS was unnecessary. The Postal Service has answered that question by formulating its own regulations.

### 3. *Postal Service Regulations*

The regulations specify in detail seventeen separate categories, with additional subcategories, of factors related to the physical and cultural environment.[5] In de-

---

5. Handbook RE–6, Appendix E, lists 7 elements under the category "Physical Environment"; 10 elements under "Cultural Environment" and an additional 4 elements under "Postal Environment."

Elements listed under "Physical Environment" include topography, geology and soils; hydrology, including local ground water, adjacent streams and lakes, floodplains and wetlands, and wild and scenic rivers; prime farmland; historic and archaeological factors; fish

and wildlife; and botanical, including effects on vegetation and rare species.

The elements and subcategories under "Cultural Environment" include local employment and economics, including economic activity and taxes; land use and zoning patterns, including compatibility with land use and zoning, aesthetic considerations, residential development, and potential for industrial development; transportation, including traffic and circulation, safety, accessibility and parking, and availability of public transit; noise; air quality; population

scribing the affected environment and environmental consequences of a proposed action, decisionmakers are instructed to evaluate the project's effect on each element. *See* Handbook RE–6, Appendix E. The regulations require a narrative description of each listed element to explain the assessment's findings.

Palatine alleges that the environmental assessment failed to adequately consider (1) the detrimental impact the facility would have on Palatine's long-range planning goals; (2) the fact that building on the McDade site violates Palatine's zoning laws; (3) the negative effect the facility will have on developing adjoining parcels of land; (4) the adverse impact the facility will have on the Salt Creek floodplain; (5) the detrimental economic effects on Palatine's tax base; (6) the adverse effect of increased noise on nearby residential areas; and (7) the increased traffic congestion the new facility will cause. The Postal Service does not dispute that its regulations require it to consider these factors but contends that it considered them adequately.

Although the Postal Service must consider every factor its regulations specify, we do not believe that they all carry equal weight in determining whether a project's impact on the environment will be significant. We interpret the Postal Service regulations in light of the purpose and policies of the Act they were drafted to implement. The rulings of the Supreme Court and the regulations of the Council on Environmental Quality reveal that as a threshold matter, NEPA is concerned with actions that cause a primary impact on the physical or natural environment. *See Metropolitan Edison v. People Against Nuclear Energy*, 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983); 40 C.F.R. § 1508.14 (1989). When an action will impact the natural environment, NEPA requires that agencies also consider the socio-economic and cultural effect of their plans. As NEPA regards some effects to be more significant than others, we interpret the Postal Service regulations accordingly.

We therefore conclude that as a threshold matter, the Postal Service must consider the facility's impact on the physical environment. As the record does not persuade us that the Postal Service fully considered the facility's impact on the physical environment, we go on to examine the EA's treatment of secondary impacts on the human environment, such as changes in land use plans and tax and economic consequences.

### 3. The environmental assessment: A hard look?

Count III specifically criticizes the environmental assessment that the Postal Service released in May 1988. We write, however, with the knowledge that the Postal Service subsequently altered its plans to permit building in the floodplain and then, after this litigation began, changed them once more to avoid that result. The Postal Service assures us that its redesigned plans will fit the assumptions in the May 1988 EA. Our discussion of count I demonstrates, however, that the affidavits do not clearly show that the new designs will fully incorporate the assumptions underlying the May 1988 EA's study of the potential impact on the floodplain. Furthermore, as the following discussion will show, even the May 1988 EA does not adequately consider the potential impact on the floodplain. Clearly, then, the Postal Service will need to further study this potential impact on the physical environment. As we later explain in more detail, we would suggest that the impact be evaluated not in light of the present use of the property but in light of the anticipated use if the Postal Service did not build on the McDade site. An environmental assessment that fully deals with the project's impact on the floodplain, the other elements of the physical environment, and the secondary effects on the human environment, in light of the alternative uses that Palatine plans for the property, may well be able to adequately establish that building the facility on the McDade site will not produce a significant impact. We turn

---

trends and housing; relocation of employees, residences or businesses; availability and proximity of community services like food, medical

care and fire protection; utilities; and energy requirements and conservation.

now to Palatine's specific criticisms of the May 1988 environmental assessment.

### a. *The Floodplain*

Palatine criticizes the May 1988 environmental assessment for failing to adequately consider the adverse impact the facility will have on the Salt Creek floodplain. Although the EA assumed that no actual construction will occur in the floodplain, it noted that the plans would substantially increase the area of the site that is impervious to rainwater, thus creating potential problems with runoff. To solve those problems, the EA assumed that a sufficiently large retention basin would be built to hold stormwater and release it slowly, thus alleviating the potential for increased flooding. Yet even with a retention basin, the amount of runoff that eventually reaches the floodplain will increase, and the EA did not assess this impact.

Even when a project does not entail actual construction within a floodplain, administrative regulations require the Postal Service to gather, and include in the environmental assessment, information about the project's potential impact on the floodplain. 39 C.F.R. § 776.5(b) (1989). In *Savia v. USPS*, 659 F.Supp. 653 (D.D.C.1987), the court found that the Postal Service had failed to comply with these regulations. In *Savia*, as in this case, the Postal Service planned to build very close to, but not within, the floodplain, and it had already designed plans that would adequately deal with stormwater runoff. *Id.* at 654–55. Yet the court found that the Postal Service had failed to adequately document the contemplated facility's impact on the floodplain:

> [T]here is simply no question that the postal facility will have some impact on the floodplain. First, construction of the facility will take place within three feet of the floodplain.

*Id.* at 657. The *Savia* court also ruled that several "cursory" paragraphs written in a "conclusory" fashion in the environmental assessment failed to satisfy the Postal Service's obligation to consider the potential environmental consequences of building so close to a floodplain. We believe the environmental assessment here is subject to a similar criticism.

### b. *Land Use and Zoning*

The environmental assessment acknowledged that building the facility on the McDade site violates Palatine's zoning ordinances and will irrevocably thwart Palatine's comprehensive long-range development plan. Palatine also contends that the assessment inadequately considered the project's adverse effect on the potential to develop neighboring parcels of land.

■ The Council on Environmental Quality recognizes that changes in patterns of land use are among the environmental effects that agencies must consider under NEPA. 40 C.F.R. § 1508.8(b) (1989). Indeed, insofar as zoning laws may be regarded as local laws imposed to protect the environment, they appear to be included in the Council's list of factors to consider in deciding whether contemplated agency actions "significantly" affect the environment. *See* 40 C.F.R. § 1508.27 (1989).[6] Under the facts of this case, however, we do not regard Palatine's zoning ordinance as a regulation designed to protect the environment. Clearly then, it is possible for the Postal Service to properly conclude that its facility will produce no significant environmental impact even though it will contravene Palatine's zoning laws.

Palatine's zoning ordinance would restrict the planned facility to a manufacturing area, and the McDade site is zoned for commercial use. The EA noted that the surrounding area includes both manufacturing and commercial usages and the environmental assessment considered the facility to be generally compatible. The EA also

---

**6.** The regulation provides:

"Significantly," as used in NEPA requires considerations of both context and intensity:

. . . .

(b) Intensity. This refers to the severity of impact.... The following should be considered in evaluating intensity:

. . . .

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27 (1989).

noted that Palatine's master land use plan provided for commercial development of the McDade property and planned a road that would run along the west side of the McDade property to reach the parcel immediately to the north that is zoned for manufacturing. The EA recognized that the proposed project would make Palatine's plan "impossible to achieve" and further noted that it would not be practical to extend the road immediately to the east of the McDade site to the property zoned for manufacturing. The assessment further noted that the manufacturing-zoned parcel could be accessed from Wilke road and Thomas streets, to the east.[7] We do not regard the assessment's discussion to be inadequate.

### c. *Tax Consequences to Local Government*

Palatine also criticizes the environmental assessment's analysis of the tax consequences to units of local government. The May 1988 assessment noted that development of the McDade site in accordance with Palatine's long-range plan would yield $1,600,000 in taxes each year. The assessment proposed a figure of $974,000 as a "reasonable estimate" of the taxes that commercial development would produce. The EA acknowledged that the potential tax consequences to local government were not insignificant. Although Palatine quarrels with the figures that the assessment used, we do not find fault with the Postal Service's consideration of the tax consequences of building on the McDade site.

### d. *Additional Factors*

Palatine also contends that the environmental assessment inadequately considered increased traffic congestion and noise that would carry to neighboring residential areas. In particular, Palatine contends that the EA used figures for traffic counts that are not accurate, in part because they did not account for the reopening of the nearby Arlington Race Track. The Postal Service counters that it did estimate the increased

traffic that the race track would generate. Because the Postal Service enjoys a wide latitude in which it may rely on its experts, *see Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989), we have no need to resolve this dispute over the proper figures to use in estimating the facility's impact on traffic congestion. And, for the following related reasons, we are not inclined to regard the Postal Service's plans, and their impact, in isolation.

### 4. *Anticipated Alternative Uses*

Although Palatine would prefer that the Postal Service just go away, it has devoted considerable energy to convincing the Postal Service to locate instead at the Brandt site so that the Mitroff development may proceed on the McDade site. Because the facility's impact cannot reasonably be evaluated in a vacuum, we believe that the potential alternative development of the McDade site is a relevant consideration. We note that Palatine asks for a discretionary equitable remedy. It is appropriate to compare the plan Palatine seeks to enjoin with the compromise it sought to arrange in the year before this litigation began. In redrafting the EA, it is appropriate for the Postal Service to make the same comparison.

The deal that Palatine sought to seal would improve its tax position, accommodate its zoning laws, and interfere less significantly with its development plan. On the other hand, the deal would produce many of the same adverse environmental impacts that the Postal Service arguably failed to consider adequately in its environmental assessment. The Mitroff development calls for actual construction on the floodplain and would thus affect the natural environment more significantly than the Postal Service facility. We cannot see how Palatine's plan would affect the water quality of Salt Creek any less. Moving the postal facility to the Brandt site would

---

**7.** It appears that Palatine contends that the project would harm the development potential of additional neighboring parcels of land and that the assessment did not discuss this additional impact on land use patterns. We have not be able to determine which lots Palatine is talking about. Naturally, in redrafting the environmental assessment, the Postal Service should take care to consider the entire area that will foreseeably be affected by building the planned facility.

bring noise and truck traffic even closer to residential areas. The combined effect of the two developments will congest Northwest Highway even more than the plan considered in the environmental assessment.

■ In conclusion, because the record does not reveal that the Postal Service took the requisite hard look at every relevant factor, we cannot rule at this time that it properly concluded that building on the McDade site would not significantly impact the human environment. We therefore deny the Postal Service's motion for summary judgment.

### C. *Count IV*

In count IV, Palatine contends that the Postal Service failed to adequately consider and compare the environmental impact of building the facility at alternative sites, a duty it contends is mandated both by the National Environmental Policy Act and the administrative regulations of the Postal Service. The Postal Service contends first that neither NEPA nor its regulations require it to consider alternative sites. In the alternative, the Postal Service contends that it adequately carried out whatever legal duty it may have to consider and evaluate alternative sites.

### 1. *NEPA Requires Consideration of Alternative Sites*

■ Section 102(2)(E) of the National Environmental Policy Act requires that agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). As the Seventh Circuit has explained, this requirement is independent of the agency's duty to determine whether a project will significantly affect the human environment. It is operative even if the agency finds no significant environmental impact. *See River Road Alliance v. Corps of Engineers,* 764 F.2d 445, 452 (7th Cir.1985), *cert. denied,* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986); *Nucleus of Chicago Homeowners Assn v. Lynn,* 524 F.2d 225, 232 (7th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

When the impact of a contemplated project is not significant enough to require an environmental impact statement, the agency must nevertheless explore alternatives as long as the project will produce some harmful impact. "[N]onsignificant impact does not equal no impact; so if an even less harmful alternative is feasible, it ought to be considered." *River Road Alliance,* 764 F.2d at 452. *See also City of New York v. U.S. Dept. of Transp.,* 715 F.2d 732, 742 (2d Cir.1983) (under § 102(2)(E), federal agencies must "study alternatives to any actions that have an impact on the environment, even if the impact is not significant enough to require a full-scale EIS"), *appeal dismissed* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984).

The Postal Service argues that section 102(2)(E) does not require that it evaluate the environmental impact of building on alternative sites. The Postal Service argues that the law requires only that it consider the environmental impact of "reasonable alternatives." To fulfill this duty, the Postal Service argues, it evaluated the environmental impact of three alternatives: (1) no action; (2) leasing an existing building already owned or leased by the government; and (3) buying or leasing an existing building. After rejecting these three alternatives, the Postal Service decided to build a new facility. According to the Postal Service, this inquiry and decision exhausted its obligation to explore the environmental consequences of alternative plans. We disagree.

The evaluation of alternatives mandated by section 102(2)(E) is an evaluation of alternative means to reach a general goal. *See Van Abbema v. Fornell,* 807 F.2d 633, 638 (7th Cir.1986). Once the Postal Service narrowed its objective to that of building a new facility, its goal was nevertheless broad: finding a suitable location. In the process of reaching that goal the Postal Service must, in accordance with section 102(2)(E), explore the range of alternatives. That range includes alternative sites. *See, e.g., Marquez–Colon v. Reagan,* 668 F.2d 611, 616 (1st Cir.1981) (issue of site selection can raise "serious environmental ques-

tions which should be addressed under § 102(2)(E)"); *Nucleus of Chicago Home-owners Assn. v. Lynn*, 524 F.2d 225, 232 (7th Cir.1975) (alternatives under § 102(2)(E) include alternative sites), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

### 2. *Postal Service Regulations*

■ Having concluded that NEPA requires a study of alternative sites, we turn to Palatine's second contention: that the regulations of the Postal Service also impose a duty to explore alternative sites and, furthermore, require the Postal Service to evaluate and compare the environmental impact of pursuing these alternatives. The Postal Service argues that its regulations do not require that it evaluate the environmental consequences of alternative sites.

Before tackling the labyrinthine administrative regulations, our first resort is to common sense. When an agency contemplates moving to a new facility, it must certainly decide between the alternatives of moving or not. The alternative of moving includes a range of subsidiary alternative choices. The most prominent among these is the site: where should the new facility be located. We would be most surprised to discover that the Postal Service's detailed regulations permit the agency to consider building a new facility without studying various alternative locations.

Indeed, our study of the regulations turns up no surprises. The regulations in Handbook RE–6 require the Postal Service to study alternative locations. They also require that these alternative locations be described and evaluated in environmental assessments.

In the regulations, an environmental assessment is called a Site Planning Report Environmental Assessment. That is the title of the May 1988 document that Palatine contends is inadequate. In paragraph

234.1, Handbook RE–6 clearly reveals that the regulations contemplate an environmental assessment that will study more than one site:

[T]he site planning report environmental assessment is prepared as follows:

a. The responsible postal official issues a notice of intent to prepare the assessment.

b. The contending sites are identified.

c. Preparation of the assessment must begin as soon as the contending sites are identified.

d. The assessment must evaluate each combination of site alternative that has been identified by the process described in 224.2,[8] as well as the no action alternative (the present baseline situation).

The following paragraph requires that the assessment's conclusion

must contain, for each alternative (except the no action alternative), a recommendation for the preparation of either a finding of no significant impact or an environmental impact statement.

Paragraph 234.2. In requiring that the environmental assessment analyze each alternative, it is thus clear that the regulations require the Postal Service to evaluate the environmental consequences of pursuing its plans at alternative sites.

This conclusion is confirmed by paragraphs 235.1 and 235.5, which provide that Postal Service officials shall use the environmental assessment to determine which site to "control." The regulations provide that Postal officials must consider three factors and choose, from the contending sites, the location that best satisfies the needs of the Postal Service, provides the greatest economic advantage, and least affects the environment. Par. 235.51. Having concluded that the Postal Service had a duty to explore alternative sites and a fur-

**8.** The process described in 224.2 produces what the regulations call operational alternatives. After these alternatives are prepared in a written report, the Site Assessment Process begins. Par. 31. That assessment must "describe in detail viable site alternatives that will satisfy the operational alternative(s)." It indicates the "matching relationship between site alternates and the operational alternative(s)." Par. 231.

After identifying "possible viable site possibilities," the Postal Service drafts a written list of "contending sites." Par. 232.2. Once that written list of contending sites is produced, the Postal Service then begins to prepare the environmental assessment. Par. 232.3. Clearly, the environmental assessment is intended to study more than one site.

ther duty to evaluate them in the environmental assessment, we next consider the Postal Service's contention that the environmental assessment adequately discussed alternative sites.

### 3. *Alternative Sites in the EA*

The Postal Service argues that even if it did have a duty to consider alternative sites, it fulfilled that duty and adequately discussed alternative sites in the May 1988 environmental assessment. It therefore contends that it is entitled to summary judgment on count IV. We disagree.

### a. *The Environmental Assessment*

■ The May 1988 environmental assessment states that the Postal Service considered twenty-four sites and four additional sites selected by the Village of Palatine. The narrative does not provide reasons for rejecting each particular site. It states that the site selection process narrowed the list down to three and eventually to one, the McDade site. Without detail, it briefly explains why two of the final three sites were rejected. For the rest, the explanation is so brief and perfunctory that we cannot conclude, on this record, that it reflects a reasoned decision based on a hard look at all relevant factors.

Other documents in the record bolster our conclusion that the environmental assessment does not adequately explain the Postal Service's rejection of alternative sites. An earlier draft of the environmental assessment, dated January 1988, listed each of the twenty-eight sites and briefly listed, for each rejected site, the reasons for the rejection. The discussion in the January 1988 draft was thus more extensive than the discussion in the final Revised Environmental Assessment. Yet the Postal Service official who reviewed the January draft criticized the discussion of alternative sites for being too scanty and incomplete. He wrote:

> More explanation needs to be included in the report to explain why these sites

were dropped and why we chose to pursue our current location.

> The terse review of our alternative sites could prove to be very damaging when we try to prove that this is the only viable site for our needs. We need to verify that we have completed a thorough site evaluation of all the alternate sites.

> An amended environmental assessment should review each of these alternative sites in more detail. If our proposed site is the only viable alternative this section should prove that contention.

Memorandum of David M. Dornbos, dated March 2, 1988, at 2–3.[9] Rather than expanding on the discussion that the Postal Service already considered inadequate, the May 1988 environmental assessment did the opposite: it contracted its discussion of the reasons for rejecting the alternative sites. The Northeastern Illinois Planning Commission criticized the final revision of the environmental assessment for its inadequate discussion of the alternative sites the Postal Service rejected:

> [T]he brief two page discussion and subsequent perfunctory dismissal of twenty-eight sites does not constitute the balanced description of each alternative nor discussion of the reasons for their elimination required for environmental assessments.

Northeastern Illinois Planning Commission, Project Review Summary Recommendation No. 88–A–011, Plaintiff's Verified Complaint Exhibit 11, at 3.

According to the draft of the environmental assessment dated January 1988, some potential sites were rejected for being too small. Those sites were rejected before the Postal Service, forced by regulations governing development in the floodplain, decided to design a facility that could fit into a 28–acre site—the approximate extent of the buildable acreage of the 43–acre McDade site. Sites that the Postal Service rejected as too small may be large

---

**9.** *See* Exhibit B, attached to Palatine's Memorandum in Opposition to the USPS Motion to Dismiss, or Alternatively, for Summary Judgment. Dornbos, Real Estate Program Manager, Chicago USPS Facilities Service Center, was the USPS

official in charge of reviewing the environmental assessment. He signed the final finding that building on the McDade site would not significantly affect the human environment.

enough for the smaller facility studied in the May 1988 environmental assessment.

The January draft of the environmental assessment also explained that some sites were rejected because of problems with flooding. It does not explain whether the entire site was subject to flooding or whether the flooding problems were restricted to only some of the acreage. As one-third of the site eventually selected turned out to be within a floodplain where the Postal Service is forbidden to build unless there is no practicable alternative, a reasoned decision would further explain the nature of the flooding at the rejected sites and distinguish it from the potential for flooding at the McDade site. Instead, the drafters of the May 1988 EA avoided that discussion by declining to mention flooding as a reason for rejecting any of the potential alternative sites.

It may well be that by late 1987 the McDade site was the only site that met the Postal Service's operational needs. We do not mean to suggest that the Postal Service is obligated to prepare a full environmental assessment or otherwise catalog all the strengths and weaknesses of each site that Postal Service officials looked at and rejected. It is enough that the Postal Service set forth enough of an explanation to enable a reviewing court to understand the basis and rationality of the rejection. Public resources need not be committed to belaboring the obvious. But the May 1988 environmental assessment fails to adequately explain why the Postal Service rejected some of the alternative sites it surveyed.

### b. *The Brandt Site*

After the Postal Service completed its May 1988 environmental assessment, it agreed to consider the Brandt site in Palatine. The Postal Service's Alternative Site Evaluation Study,[10] dated July 14, 1988, concluded that the Brandt site was a viable alternative. Eventually, the Postal Service decided to reject the Brandt site. The record does not reveal why the Postal Service made that decision or whether the

Postal Service compared the environmental impact of building at the two sites. Without an explanation, we have no basis upon which we could conclude that the Postal Service's decision to reject the Brandt site was a reasoned decision made after a hard look at the relevant factors. Consequently, the Postal Service could be entitled to summary judgment on this portion of Palatine's claim only if it had no legal duty to consider the Brandt site.

The Postal Service argues that any legal duty to consider alternative sites does not include a duty to consider the Brandt site, as it was not part of the original process of reviewing sites. We agree with the general proposition that an agency's duty to consider alternatives must at some point come to an end so that a decision, once properly made, can be put into action. Yet even when agencies prepare a full environmental impact statement, they may sometimes be required to consider previously unavailable information that may require revised conclusions. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989). In entertaining the Postal Service's argument here, we will assume that the May 1988 EA properly documented the Postal Service's consideration and rejection of alternative sites, and that the Postal Service could have proceeded on the McDade site without violating NEPA or the regulations of the Postal Service.

We do not need to decide whether NEPA always requires an agency to consider a new site, like the Brandt site, that is proposed for the first time by an adversely affected community at this late date in the planning process. In this particular case, the Postal Service agreed to consider the Brandt site and concluded that it was a viable alternative. The fact that the Postal Service agreed to consider and study the Brandt site demonstrates that the decision-making process for planning a new facility was not yet so advanced that consideration of alternative sites was impractical or un-

---

**10.** *See* Exhibit E, attached to Palatine's Memorandum in Opposition to USPS's Motion to Dismiss, or Alternatively, for Summary Judgment.

reasonable. The project was at a stage where the Postal Service still had "a meaningful opportunity to weigh" the environmental consequences of alternatives. *See Marsh*, 109 S.Ct. at 1858, quoting *TVA v. Hill*, 437 U.S. 153, 188 n. 34, 98 S.Ct. 2279, 2299 n. 34, 57 L.Ed.2d 117 (1978). Thus, when the Postal Service agreed to study the Brandt site, section 102(2)(E) of NEPA governed the decisionmaking process. The Postal Service cannot escape the requirements of NEPA simply by asserting that the Brandt site was not a contending site and was not part of the original site review process.

For the foregoing reasons, we conclude that under NEPA and binding administrative regulations, the Postal Service was obligated to study alternatives, and that obligation included an obligation to study alternative sites. We therefore reject the Postal Service's motion to dismiss count IV. As the record does not permit us to conclude that the Postal Service complied with its legal duties, we also deny Postal Service's motion for summary judgment on count IV.

### D. *Count II*

We deal with count II briefly, because full consideration of the issues it raises is premature. The Postal Service is entitled to judgment on count II only if we rule that as a matter of law, the facility will not "significantly" affect the human environment. We have specified our concerns about the May 1988 EA, particularly in view of the unsettled nature of the current plans for the facility. The fact that the May 1988 EA is not complete, however, does not establish that an EIS is either necessary or unnecessary. The Postal Service's motion to dismiss or for summary judgment on count II is therefore denied without prejudice.

### E. *Count V*

In count V, Palatine alleges that the Postal Service failed to comply with the Intergovernmental Cooperation Act, Executive Order No. 12372, and the corresponding administrative regulations of the Postal Service. The Postal Service moves to dismiss on the grounds that violation of the Intergovernmental Cooperation Act does not constitute grounds for injunctive relief. Alternatively, the Postal Service moves for summary judgment on the ground that the record demonstrates that the Postal Service fully complied with its duties under the Act, the Executive Order, and its own administrative regulations.

### 1. *Motion to Dismiss*

■■■ We have read the district court cases that the Postal Service cites to persuade us that violations of the Intergovernmental Cooperation Act cannot provide a basis for injunctive relief. *See Azzolina v. U.S. Postal Service*, 602 F.Supp. 859, 863 (D.N.J.1985); *Township of Clinton v. U.S. Postal Service*, 638 F.Supp. 763, 767 (D.N. J.1986). We agree with Palatine that these cases do not invariably bar injunctive relief. Furthermore, it has been held that injunctive relief can be appropriate when agencies of the United States government, and specifically the Postal Service, fail to comply with the Intergovernmental Cooperation Act. *See City of Rochester v. U.S. Postal Service*, 541 F.2d 967, 976 (2d Cir. 1976). Because we agree with the Second Circuit's analysis, we conclude that injunctive relief can be appropriate. Palatine has therefore stated a claim on which relief can be granted, and accordingly we decline to dismiss count V.

### 2. *Summary Judgment*

In the alternative, the Postal Service contends that the record shows that it has fully complied with the Intergovernmental Cooperation Act, the Executive Order issued under it, and the corresponding administrative regulations. In *City of Rochester, supra*, the court explained that under the Intergovernmental Cooperation Act

the agency has an affirmative obligation to develop a reviewable record, including a list of the factors which support its decision to act in disharmony with local planning objectives, so that a reviewing court can determine whether the agency has acted arbitrarily or capriciously in claiming it has fully considered, but rejected, local planning objectives.

541 F.2d at 976. The Postal Service argues that that affidavit of Thomas Aggen, attached to its Memorandum as Exhibit G, constitutes a reviewable record that would satisfy the ruling in *City of Rochester*.

The Aggen affidavit discusses the Postal Service's correspondence with Tom Berkshire of the Illinois State Clearinghouse. Berkshire is designated the state's single point of contact, a term that merits an acronym, SPOC, in the tangled regulations that describe federal agencies' responsibilities under the ICA. Briefly, the SPOC informs federal agencies when their proposals spark the sort of concerns, on the part of state or local planning officials, that are covered by the Intergovernmental Cooperation Act. The Postal Service must try to accommodate these concerns. When the concerns cannot be accommodated, federal officials must explain the basis for their decision. *See* Executive Order No. 12372, § 2(c), 3 C.F.R., 1982 Comp., at 197. When the Postal Service does not accommodate the concerns transmitted by a SPOC, it must provide an "appropriate written explanation." Handbook RE–6, par. 733.22.

On November 17, 1987, Berkshire notified the Postal Service that the facility conflicted with the plans, policies and priorities of the State of Illinois. For further explanation, Berkshire referred to an attached letter dated November 17, 1987, from the Northeastern Illinois Planning Commission. This letter explained that the proposed facility was inconsistent with local planning. The letter emphasized that the facility would adversely affect local tax revenues by taking prime commercial property out of the tax base and also pointed out that it would increase traffic congestion in an increasingly congested area. The letter suggested that the Postal Service look for alternative sites that would not be inconsistent with local planning objectives. It suggested two specific sites that were already tax exempt.

■ The Postal Service responded to the SPOC in a letter dated March 7, 1988. While we agree with Palatine that this letter does not constitute the required written explanation, we do not need to go into detail. The Postal Service argues that even if its correspondence with the SPOC

did not comply with its regulations under the ICA, its eleven meetings with officials from Palatine and other agencies and its efforts to accommodate their concerns and examine some non-Palatine sites suggested by Palatine *did* fulfill its duties under the ICA. In this case, the SPOC was acting as a surrogate who merely relayed the concerns voiced by local planning officials. If indeed the Postal Service's direct dealings with local planning officials did meet the concerns that prompted Congress to enact the Intergovernmental Cooperation Act, then we are not inclined to grant injunctive relief simply because the Postal Service violated in technical respects its own regulation that *requires a written explanation to the SPOC*.

The Aggen affidavit provides a chronological narrative that details the Postal Service's meetings with local officials about the facility. It explains that the Postal Service attempted to accommodate local officials by making efforts to find alternative sites for the facility. The final paragraph states that the Postal Service considered more than 36 sites, including 13 sites that were considered or reconsidered at the urging of Palatine. The narrative, however, continues only until early 1989. It devotes only one sentence to the Brandt site: "Later, the Postal Service even agreed to consider the feasibility of the Brandt farm site after having commenced construction activities on the McDade site."

■ We believe that the Aggen affidavit demonstrates that until the beginning of 1989, the Postal Service was fulfilling the mandate of the Intergovernmental Cooperation Act. After that time, however, the uncontested allegations in the complaint show that Palatine and the Postal Service engaged in extensive discussions and negotiations over the Brandt site. They also show that as the Postal Service and Palatine were moving toward an accommodation, the Postal Service broke off negotiations without any explanation. We do not believe that the solitary and unspecific sentence the Aggen affidavit devotes to this subject constitutes the reviewable record described in the *City of Rochester*

ruling. That is reason enough to deny the Postal Service's motion for summary judgment at this time. While we do not doubt that the Postal Service will be able to provide a more complete reviewable record, it is not before us now. We therefore conclude that summary judgment on count V is not appropriate.

III. *Other Motions*

We defer ruling upon the Postal Service's motion to stay discovery on counts I and V. We will discuss that motion and the motion for an expedited hearing at the scheduled status conference.

CONCLUSION

For the foregoing reasons, we deny the Postal Service's motion to dismiss, or in the alternative, for summary judgment, on all counts. The Postal Service's motion to stay discovery and for an expedited hearing will be discussed at an upcoming status conference.