**VILLAGE OF PALATINE, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE, Defendant.**

**No. 90 C 1712.**

United States District Court, N.D. Illinois, E.D.

Jan. 25, 1991.

**3.** Or an insurer may elect to include an expanded definition of "child" in a separate "Definitions" section of the policy.

Robert Thomas Markowski, Edward Jacob Lewis, Robert L. Denby, Jenner & Block, Chicago, Ill., for plaintiff.

Fred Foreman, U.S. Atty., Terry M. Kinney, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

In this ongoing lawsuit the Village of Palatine ("Palatine") seeks to halt construction by the United States Postal Service ("Postal Service") of a mail processing facility within its borders. In response to this court's Memorandum and Order of June 7, 1990, denying its motion to dismiss or for summary judgment, the Postal Service filed a Revised Environmental Assessment, explaining in further detail the basis for its finding that construction of the facility will have no significant impact on the environment. In the wake of this document Palatine has filed a renewed motion for preliminary injunction as well as a first amended complaint requesting preliminary and permanent relief enjoining further construction until the Postal Service satisfies the obligations imposed upon it by federal law, executive order, and its own regulations. For the reasons stated herein, we

consolidate Palatine's renewed motion for a preliminary injunction with its request for a permanent injunction and, ruling on the merits of its claims, deny Palatine's request for injunctive relief.

## BACKGROUND

In light of our extensive earlier opinion in this case, *Palatine v. United States Postal Service*, 742 F.Supp. 1377 (N.D.Ill. 1990) (*Palatine I*), we review the legal and factual background only to the extent necessary to resolve the issues raised by Palatine's amended complaint.

### I. *Legal Background*

As a federal agency the Postal Service's actions in this case have been guided by a combination of federal statutes, executive orders, and administrative regulations. Pursuant to the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U.S.C. § 4321 *et seq.*, agencies contemplating "major" actions "significantly affecting the quality of the human environment" must prepare an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(C). Although there is no statutorily required length or amount of detail an EIS is costly, both in money and in time, and the resulting document is a "formidable" one. As the Seventh Circuit has acknowledged, "[i]f such a statement were required for every proposed federal action that might affect the environment, federal governmental activity and the private activity dependent on it would pretty much grind to a halt." *River Road Alliance, Inc. v. Corps of Engineers of United States Army*, 764 F.2d 445 (7th Cir.1985), *cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).

Guided in large part by regulations promulgated by the Council on Environmental Quality, 40 C.F.R. §§ 1501–08 (1989), agencies conduct a more limited Environmental Assessment (EA) to determine whether a proposed action will cause a significant impact requiring completion of an EIS.[1] 40 C.F.R. §§ 1501.3–.4 (1989). If an EA finds that a project will not impose a

significant environmental impact, the agency involved issues a Finding of No Significant Impact (FONSI), which allows it to avoid an EIS. If the project will have some, but not a significant, impact on the environment, NEPA still requires the agency to consider alternatives that may have less of an environmental impact. 42 U.S.C. § 4332(2)(E).

Pursuant to Executive Order 11988, Floodplain Management, all agencies must "provide leadership" in preventing flood loss by avoiding "direct or indirect support of floodplain development wherever there is a practicable alternative." 3 C.F.R. § 117 (1977). In considering a proposed action an agency must first determine whether it will occur in a floodplain; if so, the agency must consider alternatives to avoid adverse effects and incompatible floodplain development.

Recognizing that sound development of urban communities "depends to a large degree on the social and economic health and the sound development of smaller communities and rural areas," 31 U.S.C. § 6506, Congress, in the Intergovernmental Cooperation Act of 1968 (ICA), has directed the President to prescribe regulations to govern planning of federal projects with a significant impact on community development. When federal and local objectives, such as "appropriate land uses for housing, commercial, industrial, governmental, institutional, and other purposes," 31 U.S.C. § 6506(b)(1), conflict, federal agencies are to make "reasoned choices." Executive Order 12372 directs federal agencies to promulgate regulations to implement the ICA. 3 C.F.R. § 197 (1982).

All of the above statutes, orders and regulations direct federal agencies to draft regulations to implement them and the Postal Service has acted accordingly. *See* 39 C.F.R. §§ 775–78 (1989). The Postal Service also has issued more detailed regulations in Handbook RE–6, Environmental and Intergovernmental Review Procedures, that are enforceable in the courts under the

---

**1.** The proposition that an EA is less detailed than an EIS is relative. The EA we are asked to review is approximately 75 pages in length, with seven appendices that are even longer.

Administrative Procedure Act (APA). 5 U.S.C. § 701, *et seq.*

## II. *Factual Background*

Inasmuch as this dispute will be resolved on the administrative record before the court,[2] and in light of the detailed background set out in our prior opinion,[3] we present a somewhat truncated factual background at this point in our opinion. Where relevant to resolution of specific issues, we shall set forth more detailed facts in the discussion and analysis below.

Faced with anticipated continued growth of its North Suburban service area, encompassing the growing north and northwest portions of Metropolitan Chicago, the Postal Service has decided that its existing regional mail processing facility for that area is ill-equipped to fulfill future needs and that an additional facility is needed. This dispute arises out of the Postal Service's decision to build that facility on a 43–acre parcel in Palatine known as the McDade site. The Postal Service's plans include a 628,750 square foot, two-story facility with parking for approximately 1089 vehicles. Operating 24 hours a day, the facility initially will employ 1500 workers; although the Postal Service initially estimated that the facility ultimately would employ 2500 workers, it now asserts that increased efficiencies from automation will drive that number downward.[4]

From Palatine's perspective, the Postal Service could not have picked a worse location. The McDade site sits at the intersection of Northwest Highway and Route 53, is zoned for commercial use and possesses, according to Palatine, prime development and tax revenue potential. Besides allegedly impairing commercial development of adjoining parcels, the Postal Service's decision removes the site from the local tax base at an estimated loss of $25 million in

tax revenue over the next 25 years. Shortly after first being notified by the Postal Service of its interest in the McDade site in August 1987, Palatine enlisted the support of other units of local and state government, several members of Congress and both Illinois senators to lobby the Postal Service to accommodate its concerns.

In January 1988, the Postal Service issued a draft EA indicating that 15.8 acres of the McDade property were located in a floodplain, thus leading the Postal Service to change its construction plans. On March 23, 1988, the Postal Service issued a revised draft EA based on these changes, to which Palatine responded that the Postal Service had failed to consider adequately the adverse effects of the facility on the environment. Two days later the Postal Service purchased the McDade site. In May 1988, the Postal Service issued another revised EA concluding that the facility would have no significant impact on the environment, thus relieving the Postal Service of the obligation of preparing an EIS.

Palatine, however, did not give up, suggesting in early 1989 that the Postal Service consider switching the McDade site for 34 acres immediately to the north known as the Brandt site. Zoned for manufacturing, the Brandt site would allow the Postal Service to build its facility without disturbing Palatine's zoning plan. Palatine also obtained a commitment from Donald Mitroff, a local developer, to develop the McDade site if the Postal Service agreed to the switch. In May 1989, the Postal Service agreed to consider the Brandt site as a possible alternative.

In a July 1989 letter to Palatine's village president, the Postal Service indicated that it had completed its alternative site evaluation study and that, while the Brandt site could be viable, Palatine first had to ad-

---

**2.** *See* Discussion and Analysis Section IB, *infra.*

**3.** We reiterate our cautionary note from *Palatine I* that the tenor of the facts detailed in that case, taken from Palatine's complaint, was vigorously disputed by the Postal Service.

**4.** Palatine contends that, having admitted the 2500–employee estimate in its answer to Pala-

tine's first complaint, the Postal Service may not now state otherwise. Palatine's argument neglects the fact that the Postal Service subsequently has denied this allegation in its answer to Palatine's amended complaint, which superseded the first complaint. *See Lubin v. Chicago Title & Trust Co.,* 260 F.2d 411 (7th Cir.1958).

dress certain issues. Palatine apparently had yet to address these issues by December 20, 1989. On January 29, 1990, the Postal Service informed Palatine that it would build the facility on the McDade site as originally planned.

On March 23, 1990, contending that the Postal Service had failed to comply with applicable federal law, Palatine filed a five-count complaint asking that this court enjoin construction of the facility. We denied Palatine's motion for a temporary restraining order and, in *Palatine I*, denied the Postal Service's motion for dismissal or summary judgment. Following that memorandum and order, which highlighted deficiencies in the May 1988 EA, the Postal Service submitted its July 1990 Revised EA. Palatine then filed its renewed motion for a preliminary injunction and its amended complaint requesting preliminary and permanent injunctive relief.

## DISCUSSION AND ANALYSIS

### I. *Preliminary Procedural Issues*

#### A. Discovery

██ Up to this point this court has continued a motion to stay discovery, filed by the Postal Service the day before Palatine was scheduled to depose Thomas Aggen, the postal official responsible for purchasing the McDade site. The Postal Service contends that we should restrict our review to the administrative record. Palatine has filed a corresponding motion to compel. For the following reasons, we grant the Postal Service's motion.

Palatine hopes to support its theory that Aggen knowingly paid well in excess of fair market value for the McDade site and then sought to cover this up by circumventing, until early 1988, the postal officials who should have overseen preparation of the early draft EA's. This theory, however, is of only limited relevance to the issues before us. Palatine does not allege bad faith in the initial selection of the McDade site, nor does it allege any connection between the price paid and the adequacy of the FONSI in the July 1990 EA. If

discovery were to continue, at best Palatine could contend that the Postal Service's true concern in belatedly considering the Brandt site was to avoid financial loss after purchasing the McDade site at an excessive price.

Only recently the Seventh Circuit reiterated the wisdom of confining review of agency decisionmaking to the administrative record. *See Cronin v. United States Department of Agriculture*, 919 F.2d 439 (7th Cir.1990). Although, as a general rule, courts are to avoid delving into the mental processes of administrative decisionmakers, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (citing *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)), where there are no formal findings examination of the decisionmakers may be the only way to ensure effective judicial review. *Id.* Even so, district courts need not make such inquiries beyond the record so long as the agency can provide "an adequate explanation for [its] action." *Id.* This court is of the opinion that the administrative record provided by the July 1990 EA, and its accompanying appendices, provides an adequate basis for determining the validity of the actions Palatine challenges. Heeding the Supreme Court's caveat that the agency's explanations inevitably will be, to some extent, *post hoc* rationalizations, *id.*, this court will view, with a critical eye, the Postal Service's consideration of the Brandt site. *Id.*

#### B. Consolidation under Rule 65(a)(2)

██ Having determined that review is properly restricted to the administrative record, it is equally clear that the evidence considered at the preliminary injunction stage would be the same as that considered in deciding Palatine's prayer for permanent injunctive relief. Having given due notice to both parties of our intention to so rule, we therefore consolidate the preliminary and permanent injunction stages of this case pursuant to Federal Rule of Civil Pro-

cedure 65(a)(2).[5]

## II. *Standard of Review*

 In addressing the environmental issues raised by Palatine, the scope of our inquiry is limited by the appropriate standard of review. This court must determine whether, in reaching its FONSI, the Postal Service took a "hard look" at the relevant factors, thus reaching a decision that was neither arbitrary nor capricious. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Van Abbema v. Fornell,* 807 F.2d 633, 637 (7th Cir.1986). Where, as here, a fairly high level of engineering expertise is involved, a concomitant amount of judicial deference is warranted. *Marsh,* 109 S.Ct. at 1861; *Baltimore Gas & Electric Co. v. Natural Resources Defense Council,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). The Postal Service must be accorded the discretion to rely upon the reasonable opinions of its own experts in making its FONSI. *Marsh,* 109 S.Ct. at 1861. As we stated in our previous opinion, the relevant issue is not whether this court would build this facility elsewhere, or whether this court believes that this facility will adversely affect Palatine or its human environment. Rather, we must determine whether the Postal Service "exceeded the bounds of its decision-making authority in concluding that its facility would not so *significantly* affect the human environment that a more detailed study of consequences was necessary." *Palatine I,* 742 F.Supp. at 1387. *See River Road Alliance,* 764 F.2d at 450. In sum, although our inquiry is ultimately "a narrow one," *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823, our role is significant:

> [This court] does not sit as a super zoning board or as a site selection mogul. The agency makes the decision, but it must explain that decision adequately so that a court can determine that it is the

end result of the process Congress has mandated and not an arbitrary decision that inadequately takes into account the factors Congress considered important.

*Palatine I,* 742 F.Supp. at 1386 (N.D.Ill. 1990).

## III. *Palatine's Entitlement to a Permanent Injunction*

In our opinion in *Palatine I,* this court indicated certain deficiencies in the Postal Service's May 1988 EA. Despite the Postal Service's attempt to alleviate these deficiencies in its July 1990 EA, Palatine contends that the Postal Service has still failed to fulfill the obligations requisite to support its FONSI and thus escape the burden of preparing an EIS. Specifically, Palatine alleges that the Postal Service has failed to 1) provide an EIS (Count I); 2) prepare an adequate EA (Count II); 3) adequately consider alternative sites on which to construct the facility (Count III); 4) comply with Executive Order 11988 (Count IV); and 5) comply with the Intergovernmental Cooperation Act and corresponding Executive Order 12372 and postal regulations (Count V). We shall first consider Counts IV and II, which challenge the adequacy of the EA's assessment of impact on the physical and human environment, followed by Count III and Count I. Finally, we shall consider Count V, a somewhat distinct issue.

### A. Counts IV and II: Adequacy of the EA and its FONSI

In Count IV of its amended complaint Palatine contends that the Postal Service has failed to demonstrate the leadership in floodplain management demanded of it by Executive Order 11988. In essence, Palatine complains that the facility will have a significant impact on the physical environment contrary to the FONSI of the July 1990 EA. In Count II, Palatine contends that the July 1990 EA has failed adequate-

---

**5.** Although the Postal Service waived any objection to discovery beyond the administrative record on the motion for preliminary injunction, such an objection could be raised anew in the subsequent permanent injunction proceeding. *Cronin,* 919 F.2d at 444. Having decided

that consolidation of the preliminary and permanent injunction proceedings pursuant to Federal Rule of Civil Procedure 65(a)(2) is appropriate, we will consider the Postal Service's motion as timely made.

ly to assess the impact of the facility on various aspects of the human environment.

■ As we stated in *Palatine I*, the postal regulations implementing NEPA list 17 factors relating to the physical and human environment that must be evaluated in light of the planned action. 742 F.Supp. at 1388 n. 5. Although each factor must be considered, they do not carry equal weight. NEPA is concerned at the threshold with actions causing a primary impact on the physical environment. *See Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983); 40 C.F.R. § 1508.14 (1989). Construing the postal regulations in this light, we concluded that the Postal Service was obligated as a threshold matter to consider those factors relating to the facility's impact on the physical environment; effects upon the human environment are secondary. As we emphasized:

> An environmental assessment that fully deals with the project's impact on the floodplain, the other elements of the physical environment, and the secondary effects on the human environment, in light of the alternative uses that Palatine plans for the property, may well be able to adequately establish that building the facility on the McDade site will not produce a significant impact.

*Palatine I*, 742 F.Supp. at 1389.

■ For each factor assessed the Postal Service's July 1990 EA considers the impact of the facility upon the environment under four circumstances: building on the McDade site; building on the Brandt site; building on the Brandt site with the Mitroff development on the McDade site; and not building at all.[6] Taking into account Palatine's most recent criticisms of the July 1990 EA, we find for the reasons set forth below that the Postal Service was neither arbitrary nor capricious in concluding that the facility would not have a significant impact on the environment.

### 1. *Physical Environment: Impact on the Floodplain*

Although the facility evaluated by the July 1990 EA will not be built in the floodplain, the plans will increase the area on the site that is impervious to rainwater above that caused by previous buildings, thus requiring the Postal Service to resolve the problem of increased runoff into the floodplain. To accomplish this, the Postal Service plans to construct a stormwater detention basin that will hold rainwater and release it slowly, at or below the rate at which it reached the floodplain before the Postal Service began construction. Palatine contends that the Postal Service's finding that this plan will have no significant impact on the environment is arbitrary and capricious because it has relied upon inaccurate rainfall estimates for the area and intends to provide only a fraction of the stormwater detention capacity needed to control flooding on the McDade site. Thus, Palatine asserts, the Postal Service has failed to demonstrate leadership in floodplain management as required by Executive Order 11988.

In planning the stormwater detention aspects of the facility, the Postal Service relied upon rainfall estimates contained in the 1961 United States Weather Bureau Technical Paper 40. Palatine contends that the Postal Service should have utilized the estimates contained in the 1989 Illinois State Water Survey Bulletin 70, which are based on a larger sample over time. Palatine claims that Executive Order 11988 requires the Postal Service to utilize "the best available information" in designing a detention basin.

The portion of Executive Order 11988 cited by Palatine, § 2(a)(1), requires agencies to utilize "the best available information" to *determine the location of the floodplain when maps are not available,* a distinct concern from that raised by Palatine. Indeed, the Executive Order makes

6. Palatine contends that the July 1990 evaluation of the Mitroff plan falsely assumes that the plan, which proposed construction in the floodplain, was final, whereas testimony from Palatine officials indicates that the plan was preliminary and would have been revised to comply with floodplain regulations. The Postal Service was entitled to rely on the plan it had before it at the time of its assessment.

no mention at all of rainfall estimates, leading us to conclude that the choice of which expert estimate upon which to rely is a matter falling within the discretion of the agency in accordance with the general rule of administrative law. *Marsh.* According to the Postal Service, the findings, methodologies and applicability of Bulletin 70 are still subject to debate. This court declines Palatine's invitation to serve as the second at a duel between expert opinions.[7]

Palatine further contends that the Postal Service intends to provide only a fraction of the stormwater detention capacity needed to control flooding on the McDade site. Regulations promulgated by the Metropolitan Water Reclamation District of Greater Chicago (MWRD), the local permitting authority, requires that post-construction stormwater runoff not exceed that of the land in its "natural and undeveloped" state. MWRD Sewer Permit Ord., § 3(b). Claiming that the MWRD interprets "natural and undeveloped" to mean the state of the land as of 1972 (the year its regulations were drafted), the Postal Service plans a stormwater detention basin of sufficient capacity to account for the increased amount of impervious area that the facility will create on the McDade site over that existing in 1972.[8] Palatine insists that the Postal Service is obligated to build a detention basin to account for the whole of the impervious area covered by the facility; to do otherwise, it argues, will impose a significant impact on the floodplain, rendering

the Postal Service's FONSI arbitrary and capricious.

Whether building a stormwater detention basin accounting only for the increased impervious area that the facility will create will have a significant impact on the environment, is quite a different question from whether the MWRD should grant the Postal Service a permit on this basis, which is clearly set out on the face of their permit application. The former question is appropriately addressed to this court as a reviewing entity. The latter, which Palatine would have this court decide, falls within the domain of the MWRD and is thus inappropriate to this forum.

With this in mind, it seems virtually axiomatic that the environmental impact, in terms of increased stormwater runoff, will be proportional to the amount of impervious area exceeding that which previously existed on the site. As long as the Postal Service constructs a stormwater detention basin large enough to account for this increase, this court can reach no other conclusion than that the Postal Service was neither arbitrary nor capricious in finding that its facility will have no significant impact on the environment. To inquire whether the MWRD, as the local permitting authority, will permit the Postal Service to proceed on this basis after it has removed all of the previously existing impervious areas from the site, entails consideration of issues beyond those within the scope of NEPA.[9]

7. Although Palatine emphasizes that the Northeastern Illinois Planning Commission has recommended that municipalities adopt a model ordinance based on Bulletin 70, no such ordinance was in effect in July 1990. The Postal Service was entitled to rely upon the law as it existed at that time.

8. According to the Postal Service's permit application to the MWRD, of the 43 total acres comprising the McDade site, 16.24 acres (comprising the floodplain) will not contain construction and 16.28 acres were impervious in 1972, resulting in an increased impervious area of 10.48 acres following construction of the 27.2 acre facility. Basing its calculations on this 10.48 acre figure, the Postal Service has calculated that it will have to build a detention basin with a capacity of 2.05 acre-feet (July 1990 EA, App.

D). An acre-foot is the amount of water required to cover one acre of land in one foot of water. Were the Postal Service to construct a basin accounting for the total developed area, as Palatine insists it must, it apparently would have to have a capacity of at least 4.98 acre-feet (Danecki aff. at 7).

9. This court notes that the July 1990 Revised EA has responded to one of the primary deficiencies noted in our prior opinion. It now contains a detailed analysis of the facility's impact on the floodplain in accordance with the mandate of 39 C.F.R. § 776.5(b) (1989), not only in terms of building on the McDade site, but also for the alternatives of building the facility on the Brandt site, building the facility on the Brandt site with the Mitroff development on the McDade site, and taking no action at all.

## 2. *Human Environment*

Despite concluding that the July 1990 EA adequately has addressed the relevant issues regarding the facility's impact on the physical environment, we will address Palatine's Count II in order to ensure a comprehensive resolution of this case. Although its complaint raises a litany of complaints regarding the impact of the facility on the human environment, Palatine's primary objection in this regard seems to concern the facility's impact on the local sanitary sewer system and on local traffic patterns. Accordingly, we address these two issues first.

### a. Impact on the Sanitary Sewer System

According to the July 1990 EA, an existing sewer system with a capacity of 800 gallons per minute is presently located on the McDade site. Based on their estimates that the facility will produce 28 gallons per capita per day (gpcpd) of sewage, the Postal Service's experts have calculated that the system's capacity is sufficient not only for existing users, but also for the proposed developments on both the McDade and Brandt sites.[10] The July 1990 EA thus found that the facility would have no significant impact on the human environment in this regard.

Palatine, however, contends that the Postal Service, by "sleight of hand," reduced its estimate that the facility will generate 57 gpcpd of sewage to 28 gpcpd in order to declare the existing sewer system adequate to accommodate the facility. Even if theoretically correct, moreover, Palatine contends that these calculations do not jibe with its own experience, which indicates that there is no excess capacity in the sewer line. Based on its own experience and calculations, Palatine insists, there is a significant risk that the facility will exhaust, if not overload, the existing sanitary sewer system (Danecki aff. at 13).[11]

As the Postal Service emphasizes, however, Palatine's argument again misses the relevant issue. Palatine does not dispute that the Postal Service's experts—including its facility designers and the consultants who performed the 1990 EA—upon performing the necessary calculations, advised it that the existing sewer line was adequate to accommodate the facility. The sum of Palatine's argument, rather, is that this court should find the Postal Service's FONSI arbitrary and capricious in this regard because it does not comport with the calculations of Palatine's own expert.

This court will not endeavor to determine whose calculations are "correct." Nor is this our proper role in the administrative process. This limitation is especially apparent where, as here, there are different methods of estimating gallons of sewage per capita per day, the choice of which is a question of professional judgment.[12] What is relevant for our purposes is that the Postal Service's experts advised it that the existing sewer line is more than adequate to accommodate the proposed facility. The Postal Service was entitled to rely upon that advice. *Marsh.*[13] We cannot declare

10. These calculations are set out in the affidavit of John Talbot, Vice–President of Epstein Civil Engineering, Inc., the facility's designer. Epstein has been responsible for design of the revised plans for the facility and for the submission of required permit applications.

11. Palatine also contends, without merit, that the Postal Service's calculations should have been based on an estimated future workforce of 2500. *See supra*, n. 4.

12. We do note, however, that surveys of wastewater generation rates for three comparable mail processing facilities in the Northeastern United States indicated an average rate of 8 gpcpd; in order to use a conservative average daily flow rate, however, the Postal Service in that case assigned a rate of 12 gpcpd. These numbers only serve to confirm the Postal Service's contention that its original estimate of 57 gpcpd was far too high and that the estimate of 28 gpcpd ultimately used for the Palatine facility was, to say the least, healthily conservative.

13. As with the stormwater detention issue, the ultimate arbiter of the adequacy of the sanitary sewer system will likely be the MWRD, by way of the permitting process. The issue it will decide is distinct from that before us—whether the Postal Service was arbitrary and capricious in concluding that the facility's sanitary sewer system, in light of the calculations of its experts, will have no significant impact on the human environment.

its FONSI arbitrary and capricious for having done so.

### b. Impact on Traffic Patterns

The July 1990 EA contains an expanded study of the facility's projected impact on local traffic patterns, which forms the basis for its finding that the facility will have no significant impact in that regard. Nonetheless, Palatine contends that the survey fails adequately to assess this issue on several grounds. Palatine urges that, according to the survey itself, upon opening, the facility will render traffic patterns on the Northwest Highway only minimally acceptable during certain peak periods.[14] Palatine further urges that the survey grossly distorts the number of employees who can be expected to enter and exit the site during peak hours, and that the peak hours themselves have been distorted because they do not directly correspond to shift changes.

Palatine's arguments are without merit. In *Palatine I*, we deemed it appropriate for the Postal Service to evaluate the facility's impact on traffic by comparing the impact of building on the McDade site with that arising from anticipated alternative uses proposed by Palatine. The traffic survey utilized in the July 1990 EA has done this, evaluating the impact of the facility on the McDade site, the Brandt site, the Brandt site with the Mitroff development on the McDade site, and with no action at all. Although, as Palatine contends, placing the facility on the McDade site will have an impact on the Northwest Highway, the survey indicates that the impact of building the facility on the Brandt site will be just as great, and the impact of building the facility on the Brandt site with the Mitroff development on the McDade site will be even greater.

The traffic survey utilized by the July 1990 EA based its estimate of the number of employees entering and exiting the site, as well as its determination of peak hours of movement, on surveys of actual movements at the Postal Service's current mail processing facility in River Grove, which

apparently employs comparable numbers of employees on shifts compatible with those anticipated for the Palatine facility. Palatine fails to see how information for River Grove, involving different employees at a different facility in a different community, can provide a reliable indicator of the amount and timing of traffic to be expected for the Palatine facility. These are, however, distinctions without a difference. The survey's reliance on empirical data gathered at a comparable facility was reasonable; the only alternative of which this court can conceive would have been to engage in pure guesswork. In light of the survey's conclusions, this court cannot label the Postal Service's FONSI arbitrary and capricious in this regard.

### c. Additional Factors

With regard to additional factors the Postal Service must consider, Palatine contends that the Postal Service failed to adequately assess the impact to the human environment that will result from the facility's 1) impact on Palatine's long-range development; 2) inconsistency with commercial zoning of the McDade site; 3) impact on the local tax base; 4) interference with nearby landowners' efforts to enjoy the use of their property; and 5) interference with development potential of undeveloped or underdeveloped land. This court, in *Palatine I*, declared the Postal Service's May 1988 assessment of the facility's impact on land use, zoning, and the local tax base to be adequate. 742 F.Supp. at 1390–91. A different result is not warranted here.

Remaining, therefore, are Palatine's contentions, really one single contention, that the Postal Service has failed to assess adequately the impact of the facility on adjacent parcels of land. Specifically, Palatine asserts that the nearby Mayfair site, which is commercially developed and currently tied in to a septic system, may never be linked to a sanitary sewer because the Postal Service has not extended existing sewer lines to the boundaries of its property; that the facility will leave the Brandt site virtually landlocked, accessible only by

---

**14.** Palatine again argues that the survey is inadequate because it fails to evaluate the impact

that an increase to 2500 employees will have on traffic. *See supra*, n. 4.

two residential roads; and that the facility will frustrate redevelopment of the businesses currently along Consumers Avenue on the McDade site's eastern edge.

Palatine's assertions raise questionable concerns. As the facility's designer indicates, it is contrary to customary practice to require developers to extend sanitary sewers through their sites to accommodate future development of adjacent developed parcels; if necessary, the Mayfair site will be able to connect to Palatine's system by constructing a sewer line to an existing line located west of Route 53 (Talbot aff. at ¶ 19). Nor will construction on the McDade site have an impact on the Brandt site, which will be accessible by the same two residential roads previously used to reach it. Finally, Palatine's claim that the facility will hinder redevelopment of the businesses along Consumers Avenue, without any indication that any redevelopment is foreseeable, is insufficient to state a claim.

In conclusion, the Postal Service has taken the requisite hard look at the relevant factors in its July 1990 EA. Its finding that building the facility on the McDade site would not create a significant impact on the environment was neither arbitrary nor capricious. Palatine is not entitled to injunctive relief on the basis of Counts IV and II of its amended complaint.

B. Count III: Consideration of Alternative Sites

▮ As we held in *Palatine I*, both NEPA § 102(2)(E) and the Postal Service regulations contained in Handbook RE–6 require the Postal Service to study alternative locations and to evaluate them in its environmental assessment. Moreover, because the Postal Service had agreed to consider the Brandt site at a stage at which it still had "a meaningful opportunity to weigh" the environmental consequences of alternatives, *Marsh*, 109 S.Ct. at 1858 (quoting *TVA v. Hill*, 437 U.S. 153, 188 n. 34, 98 S.Ct. 2279, 2299 n. 34, 57 L.Ed.2d 117 (1978)), its consideration of that alternative was governed by § 102(2)(E) as well. As we emphasized, the obligations imposed upon the Postal Service with regard to

assessment of alternative sites are not overly burdensome:

It may well be that by late 1987 the McDade site was the only site that met the Postal Service's operational needs. We do not mean to suggest that the Postal Service is obligated to prepare a full environmental assessment or otherwise catalog all the strengths and weaknesses of each site that Postal Service officials looked at and rejected. It is enough that the Postal Service set forth enough of an explanation to enable a reviewing court to understand the basis and rationality of the rejection. Public resources need not be committed to belaboring the obvious.

*Palatine I*, 742 F.Supp. at 1395. Because the May 1988 EA had failed to provide any reasons for rejecting each particular site, however, we concluded that the Postal Service had failed to meet these obligations.

The Postal Service's July 1990 assessment of alternative sites has expanded beyond the 28 sites initially considered to encompass a total of 43 sites. Having redesigned the facility to fit onto 27.2 acres, the Postal Service reconsidered all sites previously rejected as too small (July 1990 EA at iii). The EA now contains a 22–page site evaluation summary giving the Postal Service's reasons for rejecting each site on the basis of certain preliminary factors, including site control, location and economic viability. Environmental factors are then considered, with the level of analysis varying with each site's ranking after the preliminary considerations are assessed.

Palatine contends that this analysis is nothing more than unsworn, *post hoc* rationalization. Again, this *"post hoc"* element is unavoidable when a reviewing court requests an administrative agency to explain further the reasons for its actions. *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825. Viewing the July 1990 assessment of alternative sites with a critical eye, this court is satisfied the Postal Service took a hard look at all of the alternatives before determining that only the McDade and Brandt sites merited further evaluation.

As noted, the Postal Service referred the Brandt site along with the McDade site for

more detailed environmental analysis in the July 1990 EA. According to the analysis, the Postal Service ultimately found the Brandt site not to be viable because: 1) the only way to access the Brandt site without driving through residential neighborhoods would be to extend Consumers Drive through 1.5 acres of floodplain in violation of Executive Order 11988;[15] 2) increased truck, employee, and customer traffic from the facility would create a safety hazard to young people frequenting the Consumers Drive sports complex, and would be exacerbated by the increased traffic from the Mitroff development; 3) relocating the facility to the Brandt site would have an around-the-clock adverse impact in terms of noise and glare on the 21 homes that abut the site; and 4) Palatine and the Postal Service never were able to resolve their economic differences.

Asserting that the Postal Service never mentioned the floodplain issue in negotiations over the Brandt site, Palatine questions the veracity of the Postal Service's purported reliance, at least in part, on this issue in its July 1990 EA. We do not share Palatine's suspicions. A December 20, 1989 letter from Robert Hill, Acting Director of the Facilities Service Center to Mitroff indicates that the Postal Service was, in fact, concerned about building an access road in the floodplain when it evaluated the Mitroff plan for placing the facility on the Brandt site (July 1990 EA, App. A). Even if this were not the case, we would not label specious the fact that the detailed analysis of the Brandt site in the July 1990 EA identified an additional impact on the physical environment. Palatine's concern, so clearly expressed with regard to the McDade site, that the Postal Service exhibit leadership in floodplain management, should extend to the Brandt site as well.

### C. Count I: Necessity of an Environmental Impact Statement

■ Inasmuch as the Postal Service was neither arbitrary nor capricious in finding that constructing the facility on the McDade site will not significantly affect the human environment, no environmental impact statement was necessary under NEPA.

### D. Count V: Compliance with the Intergovernmental Cooperation Act

■ Palatine's Count V alleges that the Postal Service failed to comply with the Intergovernmental Cooperation Act, Executive Order 12372, and corresponding postal regulations. As we explained in *Palatine I*, each state has an individual designated as its single point of contact (SPOC) who informs federal agencies when their plans raise concerns among state or local planning officials that fall within the scope of the ICA. The ICA requires agencies to try to accommodate these concerns; if they cannot, federal officials must explain the basis for their decision. Executive Order 12372, § 2(c), 3 C.F.R. § 197 (1982). Postal Service regulations require that this explanation to the SPOC be in writing. Handbook RE–6, ¶ 733.22.

On November 17, 1987, Tom Berkshire, the SPOC for Illinois, informed the Postal Service that the facility was inconsistent with local planning. In *Palatine I*, we agreed with Palatine that the Postal Service had failed to provide the SPOC with the required written explanation for its decision to proceed with construction on the McDade site. Recognizing that the SPOC had acted as "a surrogate who merely relayed the concerns voiced by local planning officials," however, we held that the Postal Service could be deemed to have satisfied the concerns underlying the ICA by its direct dealings with local planning officials.

What remained was for us to assess the record to determine whether the Postal Service had fulfilled this mandate. Pursuant to the ICA,

the agency has an affirmative obligation to develop a reviewable record, including

---

**15.** Executive Order 11988 prohibits construction in the floodplain when there is a practicable alternative. The McDade site, which requires no floodplain construction, is such an alternative.

a list of the factors which support its decision to act in disharmony with local planning objectives, so that a reviewing court can determine whether the agency has acted arbitrarily or capriciously in claiming it has fully considered, but rejected, local planning objectives.

*Rochester v. United States Postal Service,* 541 F.2d 967, 976 (2d Cir.1976). Construing the affidavit of Thomas Aggen, which provided a chronological narrative of the Postal Service's meetings with local officials about the facility and possible alternative sites up to the beginning of 1989, we concluded that the Postal Service had satisfied the concerns of the ICA. Because the Aggen narrative stopped with the beginning of the Postal Service's consideration of the Brandt site, however, we further held that we could not determine whether the Postal Service had similarly complied in substance with the ICA in that regard.

The Postal Service, in Appendix A to its July 1990 EA, has compiled a reviewable record that fills the gap left open by the Aggen affidavit by detailing the interaction between the Postal Service and Palatine officials with regard to the Brandt site. Following a May 5, 1989 meeting between Donald Matson, Director of the Postal Service's Facilities Service Center, and Rita Mullins, Palatine's Village President, the Postal Service agreed to evaluate the viability of the Brandt site. The next month, Mullins proposed a meeting between postal officials, Palatine officials, the owner of the Brandt site, and a potential developer of the McDade site, presumably Donald Mitroff.

On June 13, 1989, Dennis Bryan, Manager of the Major Facilities Branch of the Facilities Service Center, wrote to Skip Leonard, Palatine's Assistant Village Manager. Bryan informed Leonard that, for the Postal Service's evaluation of the Brandt site to be timely made, Postal engineers would have to meet with Palatine staff no later than June 21, 1989 to discuss stormwater detention issues. Approximately three weeks later, on July 7, 1989, Donald Matson again wrote Rita Mullins to inform her that the Postal Service had completed its alternative site evaluation study of the Brandt site. Although the Postal Service had determined that the site could be physically viable, Matson outlined eight issues that Palatine had first to address— within the next 30 to 45 days because timing was critical.[16]

On November 29, 1989, Philip Wilson, Director of the Facilities Service Center, wrote Rita Mullins indicating that, following review of the Mitroff proposal, which had been clarified the previous week at a meeting between the Assistant Postmaster General, Mitroff, and Palatine's legal counsel, the Postal Service had concluded that it could not accept the proposed land exchange because it would not keep the Postal Service whole. A similar letter was relayed to Mitroff.

A December 19 meeting between Mitroff, on Palatine's behalf, and Dennis Bryan followed, and the next day, Robert Hill, Acting Director of the Facilities Service Center, wrote Mitroff to explain why the Postal Service could not yet accept his proposal. Hill first indicated that Palatine had yet to respond to the eight concerns outlined in Donald Matson's July 7, 1989 letter. Beyond his concern that the Postal Service be made "financially whole," Hill expressed concern over the operational and

---

**16.** These included

1) Retention of an existing 20 acre-foot water retention basin currently on the Brandt property;

2) Immediate development of an ingress-egress road from the Brandt property to Northwest Highway;

3) Compensation for the land to build the required road;

4) A new zoning overlay for the McDade site to a PUD mixed use classification;

5) A real estate tax abatement on the newly-zoned site;

6) Obtaining a consent agreement with the Village of Arlington Heights and the Northeastern Illinois Planning Commission agreeing to development of the Brandt site for postal use;

7) Obtaining from the Brandt site's owner an irrevocable offer to sell at a reasonable price; and

8) Obtaining from the appropriate authority a written assessment of land needs for future road widening along the Brandt site's eastern border.

safety aspects of Mitroff's plan to access the Brandt site by expanding Consumers Drive. According to Hill, the mixing of traffic from the facility, Mitroff's proposed development on the McDade site, and the existing sports complex on Consumers Drive would create a serious traffic hazard; moreover, extending Consumers Drive to the Brandt site would require construction in the floodplain. Hill left it open to Mitroff to attempt to resolve these concerns, but advised him that the project would proceed on the McDade site in the interim.

These issues apparently remained unresolved, for on January 29, 1990, Assistant Postmaster General Stanley Smith informed both Mitroff and Mullins that the Postal Service had decided to reject the proposed move to the Brandt site. Besides a desire to avoid economic loss, Smith listed as most significant the Brandt site's proximity to Arlington Crest residences, and the mixing that would occur between the truck, employee, customer traffic of the facility and that of the Mitroff proposal. On balance, Smith stated, the Postal Service had concluded that the facility was more compatible with the historical use of the McDade site, regardless of zoning.

Upon review of this record we are satisfied that the Postal Service, through its consideration of both the Brandt site and the Mitroff proposal as well as its communication with local planning officials, acted in substantive compliance with the ICA.

### CONCLUSION

This court grants the Postal Service's motion to stay discovery and denies Palatine's corresponding motion to compel, and consolidates Palatine's renewed motion for preliminary injunction with its amended complaint for preliminary and permanent injunctive relief pursuant to Fed.R.Civ.P.

---

**17.** Palatine also complains of the Postal Service's decision to provide no mitigation measures such as those it provided for a similar facility in Carol Stream, Illinois, which included, *inter alia,* construction of a helipad and a softball field "complete with a skinned infield, backstop, bleachers, and parking lot," as well as sharing the expense of road widening and traffic signal installation. To Palatine, "[t]his stinginess is inexplicable."

65(a)(2). For the reasons set forth above, this court finds that the Postal Service 1) satisfied the requirements of the applicable federal statutes, executive orders and administrative regulations, and was neither arbitrary nor capricious in making its finding of no significant impact in light of its July 1990 Environmental Assessment; 2) adequately considered alternative sites; 3) was not required to prepare an environmental impact statement; and 4) complied in substance with the mandate of the Intergovernmental Cooperation Act.[17] Palatine's prayer for injunctive relief is denied.

The Postal Service responds that if it were obligated to provide mitigation measures in response to community demands prior to construction, its facilities would be held hostage to local demands. This point is well taken. Although Palatine's unhappiness is unfortunate, it does not form the basis for injunctive relief, particularly in light of this court's findings.